United States v. Gilliam No. 21-1478, Mr. Olick and Mr. Hinckley. Take your time setting up. Whenever you're ready. Good afternoon. May it please the court, Frederick Olick for the appellant, Larry Gilliam. I'd like to reserve three minutes of my time for rebuttal. When police conduct... Is Mr. Gilliam still in jail? He's actually on supervised release. When police conduct an illegal search and seizure in violation of the Fourth Amendment, the exclusionary rule applies if consideration of the evidence from that search and seizure would essentially condone or tacitly allow future violations. That same rule has application in the context of a sentencing proceeding where police engage in... I'm going to have to raise your voice just a tad. Oh, I'm sorry. The same rule has application in a sentencing proceeding where police engage in a legal search with the aim toward enhancing a defendant's sentence. But you need a finding that the aim was toward enhancing the sentence, do you not? We need some sort of finding in that regard, and I think this case... That was presented to Judge Mariani, and he's very flexible in terms of how he approaches sentencing, and he looked at it and decided, I'm not going to touch it. Well, what he did actually... A closer examination of that ruling is that he simply read from the Torres decision and said this issue is foreclosed, and to the extent to even discuss the exception, he discussed it by reading the portion of Torres that... He said this particular decision also indicates that it did not address a situation present in the Ninth Circuit case called Verdugo, which says if you go in with the sole purpose of attempting to enhance the sentence, you can get slapped with it if you're the government. But he said, in effect, he had the opportunity to characterize this case as being one of seizing the property for the purpose of a sentencing enhancement, and he refused to go there. Well, there's no question he denied the objection and the request to exclude the evidence. But the reason he did so, it appears from my reading of it anyway, is that he's simply believing that Torres' decision forecloses this, and to the extent he's acknowledging Verdugo at all, he's simply acknowledging what the court said and leaving that door ajar, so to speak. The case that we have Torres from 30 years ago essentially shuts the door unless you have a finding that the police went in for the purpose not so much of getting an arrest and possibly a conviction, but rather knowing that they would get that and they're doing so for sentencing enhancement purposes. So I think you need a finding in order to say that Torres does not apply, and I just don't see that finding. Well, the court didn't make any findings. I mean, I guess what you could say is that the implicit finding is that the exception wasn't applicable in this case. But making that assumption, the court would have then imposed a standard that nobody could meet. Don't the police actually go into the residence to find if there are drugs and to get them out of there so they don't go on the street? Well, they testified that they went there because they were concerned about drugs and the presence of children. But each of their explanations, both that, the dangerousness of carfentanil, were expressly rejected by the district court on credibility grounds. So that particular explanation holds no weight relative to why they did what they did. At the point in time when Mr. Gilliam had been arrested, at that juncture, they had in their possession detailed statements from the informant and the informant's boyfriend implicating Mr. Gilliam in supplying drugs. They set up a controlled purchase and in doing so recorded Mr. Gilliam's conversation. They then had helicopters, marked vehicles, unmarked vehicles, foot patrol officers, an audio recording, a video recording, and then a controlled buy where they arrested him immediately thereafter. There's a bunch of stuff, Mr. Ulrich, that lends support to the district court's finding that the police weren't credible when they said, this is for the kids. Okay? So accept that as a baseline for the purposes of this discussion. We agreed with Judge Mariani that the cops were picking up evidence they weren't out to do child care duty. But deal with, if you would, Judge Ambrose's point, which is a point that is, I think, particularly significant, that Judge Mariani appears to reject the idea that we're even in the Verdugo zone, that we're dealing with a circumstance where they went because they wanted to get evidence for purposes of enhancing the sentence. That's the whole, that's Verdugo's whole point, is that, and this Ninth Circuit in later cases, including ones like Kim, they go in and they're making the point that that is about an express intent. Although it looks like the Ninth Circuit might have like morphed into some objective test, I'm not sure. But all the other cases that we've been able to look at, you know, with the help of my great law clerks, and to the extent they give a nod to Verdugo, it's always about those cops are wanting to enhance the sentence. And Judge Mariani just seems to be saying, we're not in that, we're not even talking about, we're not in that realm. It's not merely rejecting or saying Torres has foreclosed it, because Torres explicitly left that question open. To the extent he says Torres is controlling, isn't he saying this is not a circumstance where there's evidence that shows they were there for sentencing enhancement purposes? Well, no other purpose was articulated, offered, or otherwise available. I mean, this situation is much closer to the circumstance in Verdugo than anything like Torres. In Torres, they're searching his apartment. He pulls up in a car, and they run out and arrest him. In a search incident to arrest, they pull his stuff out of the car. The problem is that you have the Supreme Court refusing to extend the exclusionary rule to grand jury proceedings, deportations, the federal civil proceedings, and then probation revocation proceedings. So it looks like it's going to stay with respect to convictions only. Verdugo is still out there in what was possibly, quite possibly, a richer situation. But I can't – do you know of any other cases since the 68th decision in Verdugo that – Well, a panel in the Sixth Circuit in Nichols, albeit in dicta, recommended application of the exclusionary rule in a much more wholesale fashion, and yet in conjunction with the guideline enhancements, although that has been subsequently labeled dicta. So almost every – I believe nine of the 11 circuits have left the door ajar, so to speak, or at least recognized it. The problem is, is if we're going to impose on a defendant the requirement that he has to somehow prove what's going on in a police officer's mind, well, that's a standard. What I'm saying to you is I think in order to tee up the issue, you need a finding made by the finder of fact, that is the district court, in order to have that issue teed up before us. Well, that would certainly be helpful. But he – as I read his decision, he simply says this exact circumstance was addressed by the court in Torrance. Well, no, it wasn't. This case is much more like Verdugo, where they had a controlled purchase of some sort of drug, I think heroin, and then after getting the arrest warrant some months later, they simply went to his apartment and searched it. That's not a whole lot different than what happened here on the timeline. They had everything they needed to convict Mr. Gilliam, more than enough. There was no other reason for them to go to search out his apartment or where he was living and collect the evidence, except to enhance his sentence. Well, not so. This carfentanil is extraordinarily dangerous material, and not just to the people who use it, but to the first responders who have to – who can touch it and become severely ill or even die. I mean, this is toxic, highly toxic stuff. So when you say, you know, there's no other reason, no. They got a controlled buy from somebody who's buying this very, very, very dangerous material. So getting that out of the house, that's a – why is that an incredible thing to you, Mr. Ulrich? Well, I think for a couple of reasons. First of all, this obviously didn't come out of discretionary, but the statements of the people that were using the drugs, well, they thought they were ripped off by Mr. Gilliam because the drugs weren't getting them high. So the notion that the police somehow were really worried about this carfentanil being so dangerous is a little bit contradicted by the very information they had in their possession at the time they were doing the search. But secondarily, they knew – nobody's suggesting there isn't – that carfentanil wasn't present in the drugs that were part of the controlled buy or that it wasn't present when they found it in the house, right? Correct. The amount or level or whatever makes it dangerous wasn't present, perhaps, but no one's disputing that the lab reports show that there was some carfentanil mixed in. So isn't this a little like saying, well, it's true that, you know, this toxic waste could leak and destroy the city of Bhopal, but we only knew about a little bit of it. I mean, if you know it's there and you know it's highly toxic and you know it's very dangerous – It has to be investigated. Isn't that – isn't there like a safety thing to be thought of, even if you're not worried about the adults who are in the house who know about it, and you're not worried about kids because you don't believe the kids are there? I suppose there could be an additional – anytime there's a controlled substance that might be a dangerous exception to the warrant requirement, then we might as well just get rid of it at that point. You know, in years and years on the bench, I have run into hundreds of drug cases where after the defendant is arrested with drugs, they go to his house. Usually they got sense enough to get a search warrant first, but they go to the house to get the rest of the drugs to get them off the street. That's correct. They usually get a warrant. In this case, I think it's also notable that when they got around to getting the warrant, they lied about it. As the judge described it, it was a completely disingenuous presentation of the affidavit of probable cause. Now, if carfentanil is really that dangerous, and there was a need to get it out of the house and they had information, why not just say that? Why misrepresent – why mislead? You're right. We can't get into their minds and ask, why are you a bad liar instead of an honest person? The judge thought they were liars. We give you that. The fact that they're liars doesn't mean – and apparently it didn't mean to Judge Mariani. Well, if we're construing his relatively brief discussion of Torres and the fact that he believes it's directly on point as some sort of factual finding, then that's all he has to do. But our position is he's got to do a little bit more than that, particularly when you have no explanation that's been credited by the court for the conduct of the officers. And it's not unreasonable to believe that the state police – Let's assume just for the sake of discussion we took your tactic. We thought the fact that he is implying – not implying, the fact that he's virtually saying that Torres controls, which is not a mistake if you accept that we're not in Verdugo land, except for the sake of argument that we thought, okay, he was confused. Now, you want us to say it does apply. Why don't you take on the Seventh Circuit Sanders case directly, right? They say the Supreme Court never does this by halves. They don't say, you know, it applies a little bit here, a little bit there. You're either applying to this class of cases or you're not. You seem to be saying – I don't know, maybe – are you suggesting that we put a rule in place that's not Verdugo but it's Verdugo squared or cubed, that exclusionary rule always applies no matter what the motives are in sentencing? No, I think the difficulty in this area is what you pointed out already with the question, is that how do we know what the aim of the police or the plan of the police or what's going on in their heads? We don't. We do know that all of their explanations for going into this house weren't credited. So on the spectrum of whether we have some sort of presumption that the exclusionary rule applies, no, it can't because it would be inconsistent with the balancing test that takes place. Okay. So if that's the case, meet the Sanders argument. The Sanders case says, the Seventh Circuit says, the Supreme Court doesn't go in for these sort of case-by-case positions. It applies as a class or it doesn't. And Judge Ambrose already run you through all the places where it doesn't apply, tax cases, probation violation, grand jury circumstances. There's like four or five of them where the court has looked at it and said, no, no, no. But this is a criminal prosecution. It's not a tax case. It's not a probation and parole case where the individual has executed an agreement allowing the police to search. It's not a deportation case. It's the very prosecution. And, in fact, in this day and age, most of what takes place in any federal criminal case is absent. Well, that would be an argument for it should apply regardless of motive. What you just said is an argument that it should be applied regardless of motive. And I'm trying to get you to meet the Seventh Circuit's argument, which is the Supreme Court doesn't do that. Why are they wrong about that? If you accept that it shouldn't just apply regardless of motive, wouldn't we be stepping out in an odd place to say, yeah, it applies on a case-by-case basis? Well, the Supreme Court has said that you don't look at the subjective intent of the police officers when evaluating a Fourth Amendment claim. So how is a defendant supposed to ferret out what the subjective intent is? He can't. What he can do, though, is eliminate all other possibility. And that's what happened here. There are no other reasons other than if we're going to believe that dangerous drugs themselves pose some sort of regular exception to the warrant requirement, you can come in and you can put this stuff in on the back end and punish the person just the same as if they were convicted of it. And so I'm going to take that as you're arguing that the Seventh Circuit has it wrong and it's okay to do case-by-case. Because I'm having trouble getting you to meet the Seventh Circuit argument straight on. Well, if the Seventh Circuit is saying you need some sort of standard, my standard would simply be if there's no other explanation for why the police went into this residence without a warrant other than to get drugs to enhance a sentence, then the standard's met. That's not in every case. This isn't an instance where there was some exceeding the scope of. It's not. It's a class thing. It is by class. And maybe I should give up on this. But Sanders said, and I'm presuming you're familiar with the case, you know, you're a fine advocate. They say there's no egregious violation exception. There just isn't. If Perdue goes wrong and the exclusionary rule doesn't apply in sentencing cases, period, end of subject. So they base that on the assertion that the Supreme Court doesn't proceed by halves. They don't say, okay, we'll do this case-by-case. They take classes of cases, classes of circumstances, and they say either it applies in those circumstances or it does not. That's the one thing I'm trying to get you to answer. If you can, maybe your answer is Seventh Circuit just wrong. I like that answer the best, but I don't believe they're correct in that. Yes, it's true that the Supreme Court has not addressed a sentencing case. I can't dispute that. But these other cases were ancillary or collateral proceedings. This is the proceeding. It's the criminal prosecution of the defendant. There's a guilt phase and a sentencing phase, a punishment phase. And the Supreme Court has said that the exclusionary rule is implicated in Calandra, the grand jury case, whenever the police conduct results in a criminal sanction. Well, the police conduct here results in a criminal sanction, quite a severe one actually because it pushes up the guidelines quite a bit. Is the grand jury phase part of the criminal prosecution? No, not the same as a guilt or innocence phase. It's done separately by, as you know, by the U.S. attorneys or the prosecutor in terms of investigating the case, not prosecuting it. So that's our position. With that, I'll take up the remaining questions on rebuttals. Thank you. Thank you. Mr. Hanson? May I take my mask off, Your Honor? Sure. Be sure you can. Your Honor, it's Ty Hinckley on behalf of the government. First of all, I want to thank you for giving me the opportunity to come and visit this fine city. First time I've ever been here. I enjoyed last night. You never went through on the train or I-95? I did not. I came up from Scranton, so there's no train from there. I did want to mention, though, if I do have another opportunity to argue and you decide to go to Virgin Islands, I certainly would appreciate it. I'm supposed to go every other year that they used to tell me, and I would always offer it to somebody else, and somebody else would always take it. So in 21 years, I've only been there three times. That's it. Well, perhaps you and I will be able to go someday. Been there, done that. So, Your Honors, it seems to me in the defendant's or the appellate's reply brief, they do clearly indicate that they believe there's authority to consider suppressed evidence by the district court. The primary issue, as I see it, and perhaps I'm wide of the mark, is whether there is a, what we call a verdugo today anyway, exception to that authority. It may mean that, in this case, Judge Mariani said, look, there's Torres there, and he was kind of reticent to go into the fact-finding. But what I, in effect, hear your friend arguing is you need to tell him he needs to make a finding of fact, if the argument would be to him, to the judge, hey, you suppressed this evidence once before with respect to a trial. Why can't you suppress this evidence again with respect to sentencing because one follows from the other? Let it develop. That would be, were I making the case, and I think that's what Mr. Ulrich, I understand him to be making, is let's play it out a string here. Well, that's exactly what the defendant tried to do in his objection to the pre-sentence investigative report, and the use of that excluded evidence. He indicated to the court that, at least from a defense perspective, there would be no reason for those police officers to go to the residence but to try to enhance the sentencing. We argued, or I should say I argued, at the sentencing proceeding in regards to that argument that even though Verdugo was there, there was no evidence to suggest that was the intent of the officers. Judge Mariani listened to my argument. He had read both briefs that were prepared. Posing that very exact... I got the transcript right in front of me. What's the language that you rely on for that to be a finding? Mr. Ulrich is saying maybe by implication, but is there language you can rely on where Judge Mariani says, you know what, I just don't. I think there were other motives in play, and that's why I'm not applying Verdugo. Well, there's no language there. It's one of those deals, I think you had to be there. Yeah, well, we're not. We're looking at the transcript, so where in the transcript would this sort of you had to be there moment have occurred? Well, when the judge goes through the Torres factors and he says then he turns to the Verdugo, this would be on page 122 of the appendix, excuse me, 129. 129? 129, and that's the first quadrant to the top, page 5. This particular decision also indicates that it did not address the situation present in Verdugo, which was a case cited by counsel for the defendant, which the court characterized as a case where the record showed that the evidence was illegally seized for the purpose of enhancing the sentence. Right. And then he just goes on and says, so on that basis, I'm denying your motion. So what he does basically is he recognizes that Verdugo exception, if you will. He says, I read your brief, and recall, if you will, that he. That's the most. That's the most. Exactly so. So if that is the most, and I agree with you, because I can't see any place else where they get into it at all, how do we distinguish? Because this is important for how this case gets decided, right? If, in fact, Judge Mariani had said, or we read this to say, hey, I just don't see this as fitting in a Verdugo exception, then that's a pretty narrow basis on which to decide this, because then Torres absolutely does control. And I think Mr. Ulrich acknowledges that. And this is a three- or four-page NPO that says, we're done. If he's not saying that, then we get into these much broader and more serious questions about, well, should there be a Verdugo exception? I mean, the door was left open in Torres. Now, should we leave it open, or should we shut it like the Seventh Circuit did in Sanders? And then you're talking about a much different opinion that has to be written to justify a much more far-reaching decision. So where are we, you know? Where are we with this, Mr. Ackley? Well, unfortunately for me, I think it's the less interesting question, because the whole point of the objection was to say that the police had that intent. And that's the only reason that the court is even addressing it. It's an argument that Mr. Ulrich has to make. You're talking about a sentencing range that would go from 18 to 24 months under the sentencing guidelines to, in this case, 57 to 71 months. That's a lot of time. And if you've already succeeded in connection with the suppression of evidence relating to a trial, you've got to at least make the effort to go forward. The problem is that we have a case that says that you can't leave open the question unless it's the sole purpose, or one might say maybe not the sole purpose, perhaps the primary purpose is why the police went in and seized drugs for the purpose of enhancing the sentence. If you could somehow get that type of information out, it makes a world of difference in terms of the time spent in incarceration. Yes. So the argument's being made, and why not send it back and say to the judge, okay, you can't make this determination here. We'd like you to make it explicitly. Well, that gets into the more interesting question, if I may address that. Go ahead. So we would indicate that we do not believe there is such an exception. And we say that because we can find no support for an exception in the sentencing guidelines, by statute, by regulation. The question is, are you going to import another circuit's decision-making in a fairly egregious circumstance to our circuit? That's the argument being made. Right. And our position is the court ought not to, because there's no support for it other than the decision itself. I got it. But tell me why. Let's say there's no decision out there. We're on a blank slate. Yes. And you're saying you shouldn't do this, court. Why would you say not do it other than there's no support? Give me a reason. Because, as in Scott, we have a proceeding which should be open and which the court should be allowed to look as much, as broad information as possible. And so Scott is a collateral proceeding. And Mr. Ulrich pointed out this is the case. This isn't collateral. It's the sentencing phase of the same case. Is that a distinction with a difference? I don't think it is. Because what I think the Supreme Court is saying, as Scott, is that this is a judicially created rule and that it's sufficient alone in the jury finding or jury trial context to deter the behavior they're trying to deter. And to go beyond that, the Supreme Court hasn't had the willingness, they've been very resistant to do so. The Supreme Court hasn't, but there's the Second Circuit's Tejada case where they say, absent a showing that officers obtained evidence expressly to enhance a sentence, the district court may not refuse to consider relevant evidence in sentencing. In other words, saying that's a direct nod to Verdugo, United States v. Lee, the Fourth Circuit. We would add that we're inclined to agree with the result in Verdugo. Skilling from the Fifth Circuit. We've approvingly cited Verdugo. Ryan from the Tenth Circuit. Where it says, in effect, application of the exclusionary rule is not warranted because there's no indication that they were seeking to increase the defendant's sentence. In other words, making a nod. I mean, I could keep reading you. There's 6th, 8th, 11th D.C. Circuit cases where nods are made to Verdugo. And you could read Torres as the same thing. We're just saying, you know, hey, we don't have to address that. It's not our case. So it's open. Only the, now maybe you've got more information, but it looks like the Seventh Circuit's the only one that's like, no, forget about it. Why should we follow that line of cases and not just keep, you know, say, okay, Verdugo has got much to commend it because if the purpose of the exclusionary rule is to keep the police from doing stuff, you know, from incenting them to break the constitutional boundaries, then you need to exclude. Even if it means that Mr. Gilliam is going to spend, you know, 18 months in jail instead of 36 months in jail. So I think what the Supreme Court is saying is Scott, and that's a case where they looked at a probation officer who went for a specific purpose of finding evidence. And they're saying, we're not expanding this past that which is shown to be deterrence, which is. Well, thank you. That's exactly the point. That which is shown to be deterrence. The argument Mr. Ulrich is making and the argument that the Ninth Circuit made in Verdugo is you need to do this because it is deterrence. And without deterrence, particularly in the federal sentencing system, where it's predictable how much somebody is going to get, roughly predictable, you've got an incentive for bad behavior for the cops to go in and jack up the amount of drugs that are found in disregard of the Constitution's safeguards. And here's how it would proceed logically. You got enough for the controlled by conviction. That's what you got. And so why go to the house? The only reason to go to the house is either one of two reasons. Well, they claim it was a third. Somehow they're concerned about safety of others, but the court didn't buy that. So it's either I'm going to find other things there to give additional charges, or you know what? Controlled by is not going to get us very much. How much is it going to get us? Oh, about 18 to 24 months. I don't like this guy. Let's go see what we can find there and then use it at sentencing in order to enhance the time of sentencing. And, in fact, in this case it takes it up to 57 to 71. Why could that evidence not be put before a judge, have a judge decide, and if the judge decides that, in fact, it was used for sentencing, then you are in Verdugo land. Well, first of all, I would suggest to the court that that's not what happened. I got it. I got it. It's hypothetical. And the other thing, even if you look at Verdugo and you read that case law. Maybe not. Maybe it couldn't apply to this case because you're saying, Judge, you kind of backed off and you were reticent because of Torrance. We're telling you you can go ahead and make a fact determination. So maybe it isn't really hypothetical. Again, our position is that Verdugo is vitiated by Scott. And if you read Verdugo. Scott is talking about you don't go outside too much of the trial, but the sentencing is part and parcel of what happens after. It's that if you are convicted of a trial, it is the consequence of that conviction. That's the argument. It is. Now, as I was saying, the language in Verdugo actually anticipates where a probation or parole officer does what happened to Scott. And I'll cite the language in Verdugo. They say, it cannot be supposed, for example, that the court could properly consider evidence illegally seized after conviction from the accused's home by narcotics agents or by the probation officer in a zealous but misguided effort to furnish the court with full information for sentencing. And yet that's exactly what Scott looked at in the Supreme Court, said categorically, you can do that. Let me ask you what section 18 U.S.C. 3661, what impact does that have? It's a statutory statement, right, about no limitation. Should that be weighing on our mind in this context? Absolutely. In fact, as I was saying early on in my argument, there's no support for this exception in the sentencing guidelines by statute, by regulation, or by Supreme Court precedent. And, in fact, section 18 U.S.C. section 3661, let me read that to you. No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for purposes of imposing an appropriate sentence. And what I would suggest to the court is... Does that just end the inquiry right there? I mean, exclusionary rule is a judge-made rule. Congress has spoken and said no limitation. I believe you can make the argument. And, in fact, I think as a policy, what we want is we want sentences that are informed by the best information that the court can get from any source that is probative and reliable. And that doesn't mean that once a court accepts that evidence of something suppressed, they can't take that in consideration when making the sentencing, the fact that maybe something was suppressed. But what I'm saying, I think our argument is, there shouldn't be a rule that says you don't get to look at that because we want the court to give the best sentences possible. And the only way to do that is giving the court the tools to see all the evidence and information that is out there in the universe that makes sense for this particular defendant beforehand. Thank you very much. Thank you, Your Honor. I look forward to seeing you in the Virgin Islands. Don't look for me there. Just two points. And, by the way, you don't think Wilmington is like the B.I.? Beautiful, sunny, garden spot. Just two points. One, to follow up on Judge Jordan's question and maybe do a better job answering it than I did with the Sanderson Seventh Circuit issue. And that is 3661. Yes, it has a role to play in almost every court that's approved of allowing suppressed evidence to commit a site of it. But one way to look at it is the rule itself is focused on reliability, authentication, relevance of information. It can't be read to be carte blanche. Why can't it? It says, quote, no limitation. No limitation. Let me read from another statute. That's Congress's words. No limitation shall be placed. Why doesn't that absolutely say, hey, you judges, you knock yourself out with all your exclusionary rule stuff. But when it comes to sentencing, here's what we, the Congress of the United States, say. No limitation. Why isn't that? Why can't that be read to mean no limitation? Well, because it hasn't. And Congress has spoken differently in other places. Take a look at 18 U.S.C. 2511. Prohibition on using audio, unlawfully intercepted audio or oral communications. Congress says these communications, if intercepted unlawfully, cannot be used in any proceeding, court, hearing, or otherwise. So how do you reconcile it? You can't. And this court has imposed limitations on 3661 and other instances. For example, I'm pretty sure if the information came from torture, there would be limitations on using that. But short of that, this court in the United States v. Berry said. Can you cite me to any case from this circuit or any other where they've said, yeah, 3661. We've got an exception to that. Even in Verdugo, they didn't like, they didn't come to grips with it. If 3661 is carte blanche, anything can come in at sentencing, then how do you reconcile that with this court's decision in Berry and its progeny on precluding district courts from considering arrest records? You can't. That's a limitation that's imposed by due process. And just as I said, like Congress has said in another statute, you can't consider this. So I think you have to read it. Okay. Now, I know you had something you wanted to do, but I'm stealing your time to ask you questions, Mr. Orr. I want you to go to the transcript and help us understand in context why you think the prosecutors say, I'm overruling your objection based on Verdugo, not because I don't understand Verdugo or Torres, but because they do. This specific language that was cited to us by Mr. Hinckley is, in context, the prosecutor there wasn't Mr. Hinckley. I assume it was a colleague of his, a Mr. Scott, excuse me, that we're dealing with here on page, excuse me, Mr. Smith. 129? Yeah. He specifically says, the prosecutor, there's no evidence to indicate the search was found to be illegal in this case was exclusively to enhance Mr. Gilliam's sentence. In fact, the investigation was conducted by state authorities with an eye to a state prosecution, not federal. So that seems to be pertinent. Mr. Smith has just said that. Mr. Smith was defense counsel. I don't think he said that. I think Mr. Hinckley actually said that. Oh, I'm sorry. Mr. Smith, I'm sorry. You got that right. It's your colleague, Mr. Smith. Mr. Hinckley is the government. And Mr. Hinckley has just said that to Judge Mariani. Thank you for helping me get that straight. And it's in that context, the context of your objection, Mr. Hinckley pointing that out to Judge Mariani, excuse me, Mr. Smith's objection, Mr. Hinckley pointing that out to Judge Mariani, that the judge says Torres did not address the situation of President Verdugo, which was the case cited by counsel for the defendant, where the record showed the evidence was illegally seized for the purpose of enhancing the evidence. So on that basis, Mr. Smith, defense counsel, I appreciate your efforts on behalf of your client. I'm going to overrule your objection. Let's continue. How do we read that other than understanding the court to be saying, in the context of the objection, the response, saying, I get it, I understand what Torres says, and I understand that Torres makes an allowance for Verdugo, but I'm overruling your objection. How do we read that other than saying, I just don't think we're in the Verdugo realm? Well, because it starts off with this very issue was addressed in Torres. And Torres didn't address this. I mean, that's a quote from Judge Mariani. This very issue was addressed in Torres. It wasn't. Torres left the door open. No, no, no, no. When he gets to reading the Verdugo, he simply mentions it. You said the very issue was addressed in Torres if you don't make a finding that the search of the house was for the purpose of enhancing a sentence. Well, again, I think it comes back to what you said earlier to Mr. Hinckley, and that's we're now at the point where we're guessing by implication what the judge will say. And that was really well known in our circuit. Don't decide today what you can decide tomorrow, for tomorrow may not need to be decided. But we believe that this issue is squarely presented here. I mean, this is an instance where there is no other explanation other than – Well, wait a second. When you just said there is no other explanation, I've just advanced, and so has the government, the other explanation, which is in the context of the objection made by the defense counsel, Mr. Smith, and what Mr. Hinckley pointed out to the court, the court clearly understood what the Verdugo exception was. The court clearly understood that this court had left Verdugo open. And the same court who had suppressed the evidence said, yeah, I understand your objection. I'm overruling it. Why is it not only a plausible objection, but the more plausible reading that the court was saying that this is not Verdugo? This is not Verdugo. Well, it looks to me – I'm looking at that page. It looks like he's reading out of Torres. It doesn't look like the court's making any findings relative to the specific conduct of the law enforcement officers in this case. And to get back to a question you posed earlier with respect to the objection made by Mr. Hinckley, this was not a purely state investigation. Take a look at page 67 of the suppression transcript. Detective Palka says this was a joint federal-state task force investigation with many agencies. Weren't these charges brought in two different localities before the federal governments came in and said, we're taking this over? Yes. They were brought in two localities. But you know what? It doesn't make any difference. Let's forget that there was any sentencing guideline application in this case, federal or otherwise. Go take a look at Pennsylvania 204 PA Code 303.15. Every single offense gravity score for drug cases is tied to amounts of substances. I'm pretty sure the Pennsylvania State Police clandestine lab response team is aware what drug thresholds are. And they know that additional drugs means additional time in prison. And for those reasons, we'd ask the court to remand this matter and vacate and allow it for consideration without the suppressed evidence. Thank you. Thank you for a well-presented argument. Gentlemen, we'll take the matter under advisement and we'll recess the court.